UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER BASS, III,

      Petitioner,                       Case No. 4:18-cv-13035
                                          Honorable Linda V. Parker

v.

S.L. BURT,

      Respondent,

_____/

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF
HABEAS CORPUS, DENYING PETITIONER'S MOTION FOR ORAL
ARGUMENT, DECLINING TO ISSUE A CERTIFICATE OF
APPEALABILITY, AND GRANTING LEAVE TO APPEAL *IN FORMA
PAUPERIS***

Petitioner Walter Bass, III ("Petitioner"), confined at the Muskegon

Correctional Facility in Muskegon, Michigan, seeks the issuance of a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* application, Petitioner

challenges the following state-court convictions: (i) first-degree premeditated

murder in violation of Michigan Compiled Laws § 750.316(1)(a); (ii) first-degree

felony murder in violation of Michigan Compiled Laws § 750.316(1)(b); (iii) felon

in possession of a firearm in violation of Michigan Compiled Laws § 750.224f;

(iv) possession of a firearm in the commission of a felony (felony firearm) in

violation of Michigan Compiled Laws § 750.227b; (v) mutilation of a dead body in

violation of Michigan Compiled Laws § 750.160; and (vi) being a fourth felony

habitual offender under Michigan Compiled Laws § 769.12. For the reasons that

follow, the Court is denying Petitioner habeas relief.

## I. Background

This Court recites verbatim the relevant facts relied upon by the Michigan

Court of Appeals when denying Petitioner's direct appeal:

This case arises out of the March 10, 2013 disappearance of Evelyn Gunter (the victim), whose badly charred remains were eventually discovered in the garage of an abandoned house in Detroit. The evidence against defendant in the trial court was almost entirely circumstantial.

At the time of her disappearance, the victim had an intimate, romantic relationship with defendant. The victim introduced her daughter, Jemmima Gunter, to defendant—who introduced himself as "Tiko"—in December 2012. The victim's teenaged grandson, Dalon Gunter, is the last known family member to have seen the victim alive. Dalon last saw the victim around 5:00 p.m. on March 10, 2013. She arrived at his house alone in her red Impala. The victim dropped off some groceries, spoke with Dalon for roughly five minutes, and then left in her vehicle, again alone. Dalon was unaware of her intended destination.

Early the next morning—March 11, 2013, sometime between midnight and 1:00 a.m.—Jemmima received a text message from the victim's cell phone stating "that she [the victim] was going to Chicago to help a friend" and would be back the next night. "Chicago" was misspelled, which was unusual because the victim "was a very intelligent person." Moreover, the victim "had no friends in the Chicago area that [Jemmima] knew of." Suspecting that the victim was being untruthful about her whereabouts, Jemmima responded via text, accusing the victim of lying to conceal substance abuse.[1] In reply, Jemmima received another text from the victim's cell phone.

---

[1] Although the victim had been "clean" for "over 20 years," Jemmima thought her unusual behavior might have been evidence that she had relapsed into drug use.

On the basis of the tone and content, Jemmima suspected the text message had not actually been sent by the victim. After Jemmima sent another message, "someone" responded, " I'm just going to Chicago to help my friend move. I'll be back tomorrow." The message referred to Jemmima by her nickname, "Mya," which was also unusual; the victim "always" called Jemmima by her first name rather than her nickname.

The next day, Jemmima received another text message from the victim's number that appeared to be intended for "someone named Mike" and that contained a request for narcotics, specifically "an eight ball and a 20 bag." Jemmima responded, "[Y]ou sent that message to the wrong person." The response from the victim's phone number indicated that the text had been sent to "Mike" by the victim's "friend," not the victim.

Daniel Hines is the victim's son and was living with her at the time of her disappearance. Hines last saw the victim on March 9, 2013. Thereafter, he noticed that her mail was accumulating, unopened. He later received a call from the victim's employer of 15 years indicating that the victim had not been reporting to work. Daniel was concerned and contacted his sister, Jemmima; it was unusual for the victim to be "missing from the house like that." After the last time Hines saw the victim, he tried calling her several times on her cell phone. At first, "somebody would answer it" but remain silent. Later, around March 12 or March 13 of 2013, Hines called again and heard "a man's voice on the phone[.]" Hines asked, "Who is this?" The man responded, "Tiko."

On the afternoon of March 12, 2013, a burned body was discovered in the garage of an abandoned house in Detroit. Genetic testing subsequently indicated that the body almost certainly belonged to the victim. The body was "burned pretty much beyond recognition," bound with some kind of wire, and laid out on a green plastic tarp, which was also burned. In places, the body was burned so severely that bone was visible. A blue "Bic lighter" was found in the driveway in front of the garage. [2] The lighter "stood out because it

---

[2] Although it was tested, no DNA was recovered in a sample created by swabbing the blue lighter. According to a witness qualified as an expert "in DNA analysis,"

wasn't weathered at all." A watch and necklace belonging to the victim were found near the body.

An "expert in fire investigation, cause and origin of a fire" subsequently determined that the fire "[o]riginated at the body." Chemical testing and burn pattern analysis indicated that gasoline was used as an accelerant. In order to "consume bone as with a cremation," as this fire had, it would necessarily have been "extremely hot."

On March 13, 2013, Dr. Lokman Sung, who is an assistant medical examiner and was qualified as "an expert in the field of anatomic and forensic pathology," performed an autopsy on the victim. There were "extensive burns to 100% of the body with consumption of much of the soft tissue, internal organs and fragmentation of most of the bones." A gunshot wound was discovered, with the entry wound situated in "the left top of the head behind the ear," and the exit wound located in "the left forehead region." "[T]hree fragments of a nonjacketed bullet" were "recovered from the skull." Sung determined that the burns were postmortem and occurred after the victim was shot. There "were seven loops of copper wire wrapped around the body." Sung was unable to determine whether the wire was wrapped around the victim before death or afterward. Toxicology testing returned positive results for four substances: (1) iron levels consistent with normal bodily function, (2) carbon monoxide, (3) carboxyhemoglobin (a byproduct of carbon monoxide), and (4) caffeine. The victim did not test positive for cocaine, marijuana, or alcohol. Had she used cocaine or marijuana on or after March 10, 2013, those substances would have been detected in the toxicology screening. The cause of death was determined to be the gunshot wound to the victim's head.

Kateesha Bouldin was a patron of Detroit's "Club Celebrity" several times in February and March 2013 and met defendant there,

---

there are several probable explanations for why no DNA was detected: "nobody touched it [the lighter], there was too little DNA from whomever may have touched it," there was "an inhibiting substance on the sample" (such as dirt or soil), the lighter was deliberately or inadvertently cleaned or wiped, or exposure to the elements destroyed any DNA.

where he worked as security. After speaking with defendant briefly on the evening that she met him, Bouldin gave him her cell phone number. Thereafter, she began to regularly receive telephone calls and text messages from defendant that originated from his cell phone number. However, at 2:30 a.m. on March 15, 2013—several days after the victim's body was discovered—Bouldin received a telephone call from defendant that originated from the victim's cell phone number.

On March 16, 2013, Jemmima received a telephone call from defendant, who inquired whether Jemmima still [3] wanted him to paint her house. Jemmima declined. During the conversation, defendant never mentioned the victim or her vehicle, nor did he say anything about trying to return the victim's vehicle.

After speaking with her brother, Hines, on March 22, 2013, and learning that the victim "had been no call, no-show to work for all of the days since [Jemmima last] talked to her," Jemmima became very concerned. The victim "never misse[d] work," and on the rare occasions when she did, she did so with good cause after informing her employer that she would be absent. Accordingly, Jemmima went to the police station and reported the victim missing, informing the police that the victim's Impala was equipped with Onstar.

Later that same day, March 22, 2013, the victim's Impala was located outside Club Celebrity. Defendant was working as security at the club that evening. One of the managers knew him by the nickname "Tiko." Earlier that night, Club Celebrity's deejay, Cortlant Smith— who also knew defendant as "Tiko"—had seen defendant arrive at the club alone driving the victim's Impala.

Several witnesses gave varying accounts regarding what took place at Club Celebrity on the evening of March 22, 2013. Along with her partner, Sergeant Shannon Jones of the Detroit Police Department (DPD) was dispatched to Club Celebrity after the victim's Impala was located using Onstar. The officers discovered the victim's Impala in the parking lot of Club Celebrity and, after searching it and finding no

---

[3] The victim had previously asked defendant how much he would charge to paint Jemmima's house, but Jemmima never asked him to do so.

signs of "foul play," had it towed and impounded. Despite the location and the March weather, the vehicle's sunroof was open, which led Jones to believe that the person who had parked it was likely still nearby. The Impala was parked just two spaces from Club Celebrity's main entrance, where the security personnel—including defendant—were stationed. A leather jacket bearing defendant's DNA was recovered from the Impala's rear floor well.

According to Jemmima, after learning that the victim's Impala had been located, Jemmima, Hines, and other family members went to Club Celebrity and began asking the employees if anyone knew who had been driving the Impala. While Jemmima was at the club, a security guard handed Jemmima a phone; it was a call from defendant's number. Jemmima asked defendant why he had been driving the victim's Impala, and defendant responded that, on her way out of town to Chicago with her friend "Lori," the victim had stopped at defendant's house, given him the keys to the Impala, and "[t]old him to keep her car; she was going to Chicago." When Jemmima asked, "When you called me on the 16th, why didn't you tell me then you had my mom's car?" defendant "really didn't have an answer." Instead, he complained about the Impala, indicating "that he kept calling [the victim] trying to get her to come and get her car back because he couldn't afford to keep putting gas in it and he was tired of hiding it from his girlfriend." After Jemmima sent a text to the victim's number indicating that Jemmima intended to call the police and report the victim as missing, she got a response that read, "I'm okay, just leave me alone."

According to Smith (the deejay), after arriving, the police instructed Smith to make an announcement asking whether anyone present was driving an Impala. After Smith made the requested announcement, defendant "disappeared."

According to Avria McKelvey, who is a manager at Club Celebrity and a friend of Jemmima, while the police were trying to gain access to the Impala, defendant approached and asked the police, "What are you doing by my car? What are you doing with my car?" Consistent with McKelvey's description, the victim's cousin Arbie Campbell testified that defendant approached the police who were "standing around" the Impala and spoke to them, although Campbell

was unable to hear what was said. Contrastingly, however, Sergeant Jones specifically denied that anyone ever approached the officers or claimed ownership of the vehicle.

McKelvey further testified that defendant explained his possession of the Impala to Club Celebrity's staff as "a crack rental," i.e., he claimed that the victim was allowing defendant to "rent" her Impala in exchange for crack cocaine. According to McKelvey, defendant remained at Club Celebrity for an indeterminate period of time after the police arrived, then left abruptly on foot in the middle of his shift without receiving his nightly cash pay. To McKelvey's knowledge, defendant never returned to Club Celebrity.

Cleophus Clark, Jr., who is a manager at Club Celebrity, testified that he arrived at Club Celebrity on the evening in question while the victim's vehicle was being towed, at which time defendant approached him. Defendant informed Clark that "he gave [the victim] drugs to use her car," and Clark replied, "I have to call the police." As Clark called the police, defendant left the club without collecting his nightly pay. Defendant never returned to Club Celebrity. A "cleanup man" found the victim's credit card in the Club Celebrity parking lot that evening and passed the card along to the club's owner, who in turn passed it to Clark. Eventually, the card was given to the police. Genetic testing performed on the credit card was inconclusive.

According to Campbell (victim's cousin), that same evening Campbell initiated a conversation with defendant—who called himself "Tiko"—via cell phone and text message. Campbell asked defendant "if he knew where [the victim] was," and defendant responded as follows:

> He [defendant] told me [Campbell] that he wanted to talk, but he was scared, and he wanted to let us know. He told me that she was okay at first. He was letting me know that she was his aunt. Then he later on was trying to figure out where she was.... I told him I was her cousin. He then, after so long, just stopped replying.

During the conversation, defendant indicated that he was "the only person that [the victim] ha[d] been keeping in contact with."

The next month, on the morning of April 10, 2013, defendant provided the following statement to the police "in his own words" regarding "the nature of his last contact with [the victim]":

> Evelyn [the victim] came to my home to bring me some beer. She met me on my street. While outside talking to [her] she asked me to keep her car for her, and after some discussion I agreed. She said that she was going to Chicago with a friend. A few moments later a lady in a Black Ford Fusion pulled up, and Evelyn got out her [sic] car and into the Fusion with the lady whom I heard her being referred to as Lori or Laura. [4] Evelyn then asked me did I know where she could get three eight balls from, and I said [,] 'Yes.' I then went up the street to a guy I know who sells eight balls and et cetera.

> \* \* \*

> I motioned for them to drive up the street when he said that he had it. They gave me the money, and I gave it to him and got the eight balls. We then went back up the street and Evelyn showed me how to use the Onstar on her car and gave me the proof of insurance and registration. Evelyn then got back in the Fusion and drove off. I haven't seen or spoken to Evelyn since that date.

The victim's cell phone records showed "no movement outside of the state of Michigan" and likewise no movement outside the "immediate metro Detroit area[.]" Notably, however, the victim's cell phone usage changed dramatically after March 10, 2013. After that date, "there was no longer much evidence of actual outgoing phone calls, and the text messages became very minimal." The victim's credit card statement showed purchases made in the Detroit area after the victim was last seen. [5]

---

[4] The officer in charge of the investigation, Sergeant William Hart of the DPD, was never able to identify a person named Laura or Lori associated with the victim.

[5] A March 11, 2013 purchase from "Big Daddy Liquor" using the victim's credit card generated a credit card receipt that was recovered by the police. Jemmima was shown the credit card sales receipt and opined that the signature did not appear to

8

Sergeant Michael McGinnis of the DPD was qualified, without objection, "as an expert in the field of historical cell phone record analysis and tower mapping." From March 14, 2013, through March 23, 2013, there were 15 incidents when the victim's cell phone and defendant's cell phone "were communicating with the same sector, same tower within the city of Detroit." From March 10, 2013, until March 23, 2013, there were no attempted phone calls or text messages between defendant's cell phone and the victim's cell phone. But on March 23, 2013—after the victim's Impala was located—10 separate communications took place between those phones. The last recorded communication between the victim's cell phone and a cell phone tower took place on March 23, 2013, at which time the cell phone was in communication with the tower that services the area where Club Celebrity is situated. After she disappeared, the "home tower" of the victim's cell phone (i.e., the cell phone tower most often used) changed to coincide with the "home tower" of defendant. In McGinnis's opinion, the data strongly indicated that defendant was in possession of, and used, the victim's cell phone after her death.

*People v. Bass*, 893 N.W.2d 140, 147-52 (Mich. Ct. App. 2016) (footnotes and

brackets in original).

After the Michigan Court of Appeals affirmed Petitioner's convictions,

Petitioner filed an application for leave to appeal with the Michigan Supreme

Court, which the Court denied. *People v. Bass*, 901 N.W. 2d 590 (Mich. 2017).

Petitioner thereafter filed this habeas action.

---

be in her mother's handwriting. But using only the limited handwriting samples provided by the DPD, a forensic document examiner employed by the Michigan State Police was unable to determine whether the signature on the credit card receipt matched the handwriting of either defendant or the victim.

Petitioner asserts the following grounds in support of his request for habeas relief:

> I. The trial court's allowance of evidence of "other acts" pursuant to MRE 404(b) relating to an event more than seventeen years earlier, and which did not have comparison value to the charged offense, was an abuse of discretion which denied Mr. Bass his constitutional rights to a fair trial and due process of law under the Sixth and Fourteenth Amendments, and Const. 1963, art 1 § 17 & 20 and violated the provisions of MRE 403 and 404(b).

> II. The convictions must be reversed where the substantive evidence of record was not legally sufficient to prove beyond a reasonable doubt that Mr. Bass committed them.

Petitioner also has filed a motion for oral argument with respect to his application for habeas relief. (ECF No. 12.) The Court concludes that oral argument will not aid in its resolution of Petitioner's claims and thus it is denying Petitioner's request for oral argument.

## II. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets forth the standard of review for habeas cases. A petitioner challenging the state courts' adjudication of the matter must demonstrate:

> that the relevant state court "decision" (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Deciding whether a state court's decision "involved" an unreasonable application of federal law or "was based on" an unreasonable determination of fact requires the federal habeas court to "train its attention on the particular reasons—both legal and

> factual—why state courts rejected a state prisoner's federal claims," *Hittson v. Chatman,* 576 U.S. --, --, 135 S. Ct. 2126, 2126, 192 L.Ed.2d 887 (2015) (GINSBURG, J., concurring in denial of certiorari), and to give appropriate deference to that decision, *Harrington v. Richter,* 562 U.S. 86, 101-102, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011).

*Wilson v. Sellers*, -- U.S. --, 138 S. Ct. 1188, 1191-92 (2018). When, as in this case, the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion, "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id*. at 1192.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

"AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citation omitted). In fact, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling

11

on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence." *Baze v. Parker,* 371 F.3d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)).

## III. Discussion

### A. Petitioner's Prior Bad Acts Evidence Claim

Petitioner first claims that his rights to due process and a fair trial were violated by the admission of evidence that he sexually assaulted and attempted to murder another woman, referred to as CB, seventeen years prior to the murder in this case. Petitioner argues that the evidence was irrelevant, more prejudicial than probative, and was admitted in violation of the ban on the use of prior bad acts to show that a defendant had the propensity to commit the charged crime in Michigan Rule of Evidence 404(b).

The Michigan Court of Appeals concluded that evidence regarding Petitioner's attempt to murder CB was relevant to establish his identity as the perpetrator in this case:

Contrary to defendant's argument on appeal, the evidence regarding his attempt to murder CB bears logical relevance to a fact of consequence in this case, specifically whether defendant is the person who shot and killed the victim, then tried to dispose of her body using fire. Moreover, given the similarities, the evidence regarding the CB incident tends to show defendant's scheme, plan, or system in committing the charged offenses.

Defendant contends that there is little, if any, factual similarity between his assault against CB and the facts here. We disagree. Although there are certain differences, there are a number of notable similarities: (1) CB was attacked from behind and, similarly, the victim here was shot from behind (in the back of the head), (2) both are women defendant had known for a substantial time, (3) both are women with whom defendant had some sexual relationship at the time of offense, (4) defendant poured a liquid that smelled like gasoline on CB, and, similarly, gasoline was used as an accelerant to burn the victim's body, and (5) after stabbing her and slitting her throat, defendant wrapped CB "in a carpet or something," and, similarly, the victim's body was found bound with wire atop a plastic tarp. Thus, it seems that evidence of the CB incident was both offered for a purpose other than defendant's propensity to commit the charged offenses and relevant to a fact of consequence in this case.

*Bass*, 893 N.W.2d at 154 (internal footnote omitted).  The court also concluded that the probative value of the evidence outweighed the danger of unfair prejudice, despite being a "closer question."  *Id*. at 155.

In comparison, the Michigan Court of Appeals found the evidence that Petitioner sexually assaulted CB not relevant as he had not been charged with sexually assaulting the victim in this case.  *Id*.  Nevertheless, the court concluded that the admission of the evidence was harmless in light of the "overwhelming" circumstantial evidence of Petitioner's guilt.  *Id*. at 155-56.  The court further

13

reasoned that the trial court gave a limiting instruction regarding CB's testimony that forbade the jurors from considering the evidence for improper character purposes. *Id*. at 156.

Petitioner is not entitled to habeas relief to the extent he asserts a state law evidentiary issue. This Court must defer to the Michigan Court of Appeals' determination regarding the relevancy of the Rule 404(b) evidence at issue. It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Errors in the application of state law, especially rulings involving the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker,* 224 F. 3d 542, 552 (6th Cir. 2000).

Nevertheless, "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citations omitted). Courts, however, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). "The Supreme Court has never held (except *perhaps* within the capital sentencing

context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process." *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012) (emphasis in original); *see also Bugh*, 329 F.3d at 512-513. Consequently, there is no "clearly established federal law" to which the state court's decision could be "contrary" within the meaning of § 2254(d)(1). *Bugh*, 329 F.3d at 512-13.

Moreover, even if the introduction of the prior bad acts evidence amounted to a federal constitutional error, Petitioner is not entitled to habeas relief if the error was harmless.[6] In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court held that the appropriate harmless error standard on federal habeas review is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)) "[R]elief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Davis v. Ayala*, -- U.S. --, 135 S. Ct. 2187, 2197-98 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). "There must be more than a 'reasonable probability' that the error was harmful." *Id.* (quoting *Brecht*, 507 U.S. at 637).

---

[6] For that reason, it is irrelevant that the state court found the issue of whether the probative value of the relevant 404(b) evidence outweighed its prejudice to be a "close[] question."

15

The "miscarriage of justice" standard the Michigan Court of Appeals utilized to conduct its harmlessness analysis, *see Bass*, 893 N.W.2d at 155-56, is consistent with *Kotteakos* and *Brecht*. *See People v. Mateo*, 551 N.W.2d 891, 892 (Mich. 1996). Thus, the question is whether the state court's application of that standard was "objectively unreasonable." As set forth earlier, a habeas court's role is limited to "review[ing] the specific reasons given by the state court" and the habeas court must "defer[] to those reasons if they are reasonable." *Wilson*, 138 S. Ct. at 1192. A habeas court must deny the petitioner relief "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough*, 541 U.S. at 664).

The state court's determination that the introduction of the prior bad acts evidence at Petitioner's trial was harmless in light of the "overwhelming" circumstantial evidence against him and the trial court's limiting instruction was not unreasonable. The Court therefore finds that Petitioner is not entitled to habeas relief based on this first claim.

## B. Petitioner's Sufficiency of the Evidence Claim

Petitioner next claims that there was insufficient evidence to support his convictions.

The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every

16

fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Following *Winship*, the critical inquiry on review of a challenge to the sufficiency of the evidence supporting a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citations and footnote omitted) (emphases in original). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16.

Under AEDPA, the habeas court's "review of a state-court conviction for sufficiency of the evidence is very limited." *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018). The Supreme Court has "made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*).

First, it is the responsibility of the jury to decide what conclusions should be drawn from the evidence admitted at trial. *Id*. "And second, on habeas review, 'a

federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id*. As the Supreme Court has acknowledged, "[t]his standard is difficult to meet" but "it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011). This is because "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 102-03, 131 S. Ct. 770 (internal quotation marks and citation omitted).

Petitioner initially contends that there was insufficient evidence to identify him as the perpetrator. Under Michigan law, "[T]he identity of a defendant as the perpetrator of the crimes charged is an element of the offense and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x. 147, 150 (6th Cir. 2003) (citing *People v. Turrell*, 181 N.W.2d 655, 656 (Mich. Ct. App. 1970)). The identity of a defendant can be inferred through circumstantial evidence. *See Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002); *see also Stewart v. Wolfenbarger*, 595 F.3d 647, 656 (6th Cir. 2010) (It is well-established that a "court may sustain a conviction based upon nothing more than circumstantial evidence.") Eyewitness identification is not necessary to sustain a conviction. *See*

*United States v. Brown,* 408 F.3d 1049, 1051 (8th Cir. 2005); *Dell v. Straub,* 194 F.

Supp. 2d at 648.

The Michigan Court of Appeals rejected Petitioner's sufficiency of the

evidence claim regarding his identity as the perpetrator, reasoning:

> Viewing the evidence in the light most favorable to the
> prosecution, although the identity evidence is circumstantial and
> sometimes requires reliance on an inference founded on an inference,
> there was sufficient evidence for a rational fact-finder to conclude that
> defendant was the perpetrator. Defendant was in possession of the
> victim's Impala after she died, and it is reasonable to infer from the
> record evidence that he was in possession of her cell phone, as well.
> Defendant is the last person to report seeing the victim alive and—
> after she was found dead—he claimed to be "the only person" with
> whom the victim had been communicating. Cell phone records,
> however, showed no attempted phone calls or text messages between
> defendant's cell phone and the victim's cell phone from March 10,
> 2013, until March 23, 2013. From such evidence, it is reasonable to
> infer that defendant was lying about his purported communications
> with the victim, and, in turn, it is reasonable to infer that his reason for
> lying was his desire to suggest that the victim was alive when he knew
> that she was not. It is further reasonable to infer that defendant used
> the victim's cell phone to send text messages suggesting that she was
> alive in order to deter investigation into her death. The fact that the
> victim's body was badly burned also supports these inferences.
>
> From the evidence that defendant (1) left work early on March
> 22, 2013, after the police located the victim's car at Club Celebrity,
> (2) did not collect his nightly cash pay, and (3) never returned to
> collect that pay, it is reasonable to infer that defendant had a guilty
> conscience. People do not generally perform work at a paid job but
> then fail to collect the pay owed. It is also reasonable to infer that the
> victim's credit card, which was found in Club Celebrity's parking lot
> that same evening—March 22, 2013—was deposited there by
> defendant in an effort to rid himself of incriminating evidence.
> Additionally, from the numerous similarities between the victim's

death and the attempted murder of CB, it is reasonable to infer that defendant was the perpetrator of both assaults.

Moreover, defendant's differing explanations for why he was in possession of the victim's Impala suggest that he was lying to cover up the actual reason (that he took the vehicle after killing the victim). Defendant explained his possession of the Impala to Club Celebrity's staff as "a crack rental," i.e., he claimed that the victim was allowing defendant to "rent" her Impala in exchange for crack cocaine. But he told Jemmima and the police that the victim had entrusted him to keep her Impala while she traveled to Chicago. When Jemmima asked defendant, "When you called me on the 16th, why didn't you tell me then you had my mom's car?" defendant "really didn't have an answer."

Given the circumstantial evidence and the inferences fairly drawn from it, there was sufficient evidence for a rational trier of fact to conclude that defendant was the perpetrator of the charged offenses.

*Bass*, 893 N.W.2d at 156-57 (internal footnote omitted). This was not an objectively unreasonable application of *Jackson*'s standard.

Petitioner nevertheless argues that there was insufficient evidence to convict him because the police did not recover any physical evidence linking him to the crime. However, the "lack of physical evidence does not render the evidence presented insufficient; … it goes to weight of the evidence, not its sufficiency." *Gipson v. Sheldon*, 659 F. App'x. 871, 882 (6th Cir. 2016) (citing *United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir. 2005); *see also O'Hara v. Brigano*, 409 F.3d 492, 500 (6th Cir. 2007) (finding state court's sufficiency of the evidence determination reasonable even though victim's version of events was not corroborated by physical evidence).

Petitioner next contends that there was insufficient evidence of premeditation and deliberation to support his first-degree premeditated murder conviction. The Michigan Court of Appeals rejected Petitioner's contention, reasoning:

> Defendant argues that the fatal gunshot "could have been accidentally fired," and that, therefore, there is insufficient evidence of an intentional killing, of premeditation, and of deliberation. There are several facts, however, from which a rational trier of fact could infer that the killing was intentional, premeditated, and deliberate; most notably: (1) the victim was shot in the back of the head, (2) her body was bound with wire and burned using gasoline as an accelerant, and (3) she was found in a deserted location. Moreover, the reasonable inferences from the evidence that support defendant's identity as the perpetrator also support an inference that the killing was intentional, premeditated, and deliberate. Therefore, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the prosecution, there was sufficient evidence for a rational trier of fact to find defendant guilty of first-degree murder.

*Bass*, 893 N.W.2d at 157. This also was not an objectively unreasonable determination.

A first-degree murder conviction in Michigan requires proof that the defendant intentionally killed another with deliberation and premeditation. *See Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002) (citing *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992)). "'Premeditation and deliberation may be inferred from the facts and circumstances established on the record.'" *Cyars v. Hofbauer*, 383 F.3d 485, 491 (6th Cir. 2004) (quoting *People v. Coddington*, 470 N.W.2d 478, 487 (Mich. Ct. App. 1991)). Under Michigan law, "[c]ircumstantial evidence demonstrating premeditation includes, but is not limited to (1) the prior

relationship of the parties, (2) defendant's actions before the killing, (3) the circumstances, including the wound's location, of the killing, and (4) defendant's conduct after the killing."  *Id.* (citing *Coddington*, 470 N.W.2d at 487; *People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995)).

The use of a lethal weapon is not in itself sufficient evidence to support a first-degree murder conviction, but there may be "circumstances surrounding the killing or the manner in which the weapon is used, from which a logical inference may be drawn that there was a willfulness, deliberation, and premeditation." *People v. Hoffmeister*, 299 N.W.2d 305, 308 (Mich. 1975) (quotation marks and citation omitted).  Under Michigan law, premeditation may be logically inferred from wounds inflicted on vital parts of the victim's body.  *See Lundberg v. Buchkoe*, 338 F.2d 62, 69 (6th Cir. 1964).  Evidence that the victim had been shot in the head supports a finding of premeditation and deliberation. *See Bass*, 893 N.W.2d at 157; *see also Thomas v. McKee*, 571 F. App'x. 403, 407 (6th Cir. 2014). Evidence that Petitioner attempted to conceal his crime by burning the victim's body is further evidence of premeditation.  *See People v. Gonzalez*, 664 N.W.2d 159, 163 (Mich. 2003).  Evidence that Petitioner moved the victim's body to a deserted area following the shooting in an attempt to hide it also supports an inference of premeditation and deliberation. *See People v. Johnson*, 597 N.W.2d 73, 80 (Mich. 1999).

Petitioner next claims that there was insufficient evidence to convict him of first-degree felony murder. Under Michigan law, the elements of first-degree felony murder are:

> (1) the killing of a human being; (2) with an intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm is the probable result (i.e., malice); (3) while committing, attempting to commit, or assisting in the commission of one of the felonies enumerated in the felony murder statute.

*Matthews v. v. Abramajtys*, 319 F.3d 780, 789 (6th Cir. 2003) (citing *People v. Carines*, 597 N.W.2d 130, 136 (Mich. 1999)). Malice can be inferred "from evidence that [the] defendant set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980); *see also Carines*, 597 N.W.2d at 136 (internal citation omitted). "Malice may also be inferred from the use of a deadly weapon." *Carines*, 597 N.W.2d at 136.

In the present case, the underlying predicate felony was larceny. To prove a defendant guilty of larceny under Michigan law, the state must show:

> (1) an actual or constructive taking of goods or property, (2) a carrying away or asportation, (3) the carrying away must be with felonious intent, (4) the subject matter must be the goods or personal property of another, (5) and the taking must be without the consent of and against the will of the owner.

*United States v. Payne*, 163 F.3d 371, 373 (6th Cir. 1998) (quoting *People v. Ainsworth*, 495 N.W.2d 177, 178 (Mich. Ct. App. 1992).

The Michigan Court of Appeals concluded that there was sufficient evidence to convict Petitioner of felony murder. The court found sufficient evidence of malice based on the fact that the victim was shot in the back of the head. *Bass*, 893 N.W.2d at 158. The court found sufficient evidence that Petitioner committed a felony, reasoning:

> [G]iven the evidence that defendant was in possession of the victim's Impala and her cell phone following her death, it is reasonable to infer that defendant killed the victim during the commission, or attempted commission, of a larceny of any kind.

*Id.* This was not objectively unreasonable.

Petitioner further concludes that there was insufficient evidence that he possessed or used a firearm, so as to support his convictions for felon in possession of a firearm and felony-firearm. The elements of felony-firearm are that the defendant possessed a firearm while committing, or while attempting to commit, a felony offense. *See Parker v. Renico*, 506 F. 3d 444, 448 (6th Cir. 2007) (citing Mich. Comp. Laws § 750.227(b). The elements of felon in possession of a firearm in Michigan are: (1) that the defendant was convicted of a felony, (2) that the defendant possessed a firearm, and (3) that at the time of possession, less than three or five years, depending on the underlying felony, had passed since the defendant had completed his term of incarceration, satisfied all conditions of probation and parole, and paid all fines. *Id.* (citing Mich. Comp. Laws §

750.224(f). Under Michigan law, possession of a firearm can be either actual or constructive. *Id.* (citing *People v. Hill*, 446 N.W.2d 140, 143 (Mich. 1989)).

As the Michigan Court of Appeals found, there was sufficient evidence to support these convictions. The parties stipulated that Petitioner had previously been convicted of a felony that made him ineligible to possess a firearm on March 12, 2013.[7] Further, the evidence established that the firearm was used to shoot the victim in the head.

With respect to Petitioner's conviction for mutilation of a human body, under Michigan law this conviction requires proof that Petitioner caused permanent damage to a portion of the victim's dead body, defaced a portion of the victim's dead body by marring its appearance, or removed or carried away from the whole a portion of the victim's dead body without any legal authorization to do so. *Bass*, 893 N.W.2d at 159-60 (citing Mich. Comp. Laws § 750.160). The Michigan Court of Appeals found sufficient evidence to convict Petitioner of this offense, reasoning:

> Hence, it is clear that there was sufficient evidence for a rational fact-finder to find defendant guilty of mutilation of a human body. As we have explained, it is reasonable to infer from the record

---

[7] The Michigan Court of Appeals noted that it was unclear from the record why the parties' stipulation focused solely on March 12, 2013, which was the day the victim's body was discovered but two days after she disappeared. *See Bass*, 893 N.W.2d at 158. If Petitioner was ineligible to possess a weapon on March 12, 2013, however, it presumably also was barred from doing so between that date and the date the victim disappeared.

evidence that defendant shot and killed the victim. In turn, it is reasonable to infer that defendant is the person who attempted to conceal the murder by burning the victim's body with gasoline. The body was almost totally charred, and portions of it were entirely consumed by the fire. The damage was so serious that it could not be visually determined by Dr. Sung whether the body belonged to a male or a female. And it is reasonable to infer from the record evidence that defendant lacked any legal authority to burn the victim's body. Therefore, there was sufficient evidence that defendant irreparably damaged a portion of the body and defaced it, and his conviction of mutilation of a dead body should be affirmed.

*Id.* at 160 (internal footnote omitted). This determination was reasonable.

As set forth above, the Michigan Court of Appeals' finding that there was sufficient evidence to support Petitioner's convictions was not an objectively unreasonable application of *Jackson*'s standard. Petitioner therefore is not entitled to habeas relief based on this second claim.

## IV. Conclusion

In summary, the Court holds that Petitioner is not entitled to habeas relief based on his claim that the introduction of prior bad acts evidence deprived him of a fair trial or due process or his claim that there was insufficient evidence to support his convictions. The Court, therefore, is denying with prejudice Petitioner's application for the writ of habeas corpus. In order to appeal this decision, Petitioner must obtain a certificate of appealability. 28 U.S.C. § 2253(c).

A certificate of appealability may be issued only if the petitioner "has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). To

make this showing, the petitioner must demonstrate that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.

The Court concludes that Petitioner is not entitled to a certificate of appealability with respect to his insufficiency of the evidence claim. However, the Court believes that reasonable jurists could debate whether, or agree that, the trial court's decision to allow the prior bad acts evidence resulted in the denial of fundamental fairness so as to violate Petitioner's due process rights. Therefore, the Court is granting Petitioner a certificate of appealability with respect to his due process claim. The Court also is granting Petitioner leave to appeal in forma pauperis because he was allowed to proceed in forma pauperis in this court and an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3)(A).

Accordingly,

**IT IS ORDERED** that Petitioner's application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that Petitioner's motion for oral argument is **DENIED**;

**IT IS FURTHER ORDERED** that Petitioner is **DENIED** a certificate of appealability with respect to his insufficiency of the evidence claim but is **GRANTED** a certificate of appealability with respect to his due process claim;

**IT IS FURTHER ORDERED** that Petitioner is **GRANTED** leave to proceed in forma pauperis if he seeks to appeal this decision.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: August 29, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, August 29, 2019, by electronic and/or U.S. First Class mail.

s/ B. Sauve
Case Manager